IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

CAROLYN SUE BREWER )
)
v. ) No. 1:08-0069
) Judge Campbell/Bryant
AMERICAN MEDICAL ALERT CORP., d/b/a )
VOICECARE, et al. )

## MEMORANDUM

By order entered September 15, 2009 (Docket Entry No. 47), the undersigned denied defendants' motions to disinter and perform an autopsy on the body of plaintiff's decedent, Mr. Mitchell Lee Brewer. Defendants thereafter filed a joint motion for review by the District Court of the undersigned's order, and supported the motion with several items of evidence not previously of record in this case. (Docket Entry No. 55, Exh. 1-6) On December 29, 2009, Chief Judge Campbell denied this joint motion for review without prejudice, and returned the motions to disinter to the undersigned, with the following instructions: "The Magistrate Judge shall consider the additional information submitted by Defendants and determine what, if any, difference it makes in his prior decision. The Court takes no position on this matter." (Docket Entry No. 62)

As further explained below, the undersigned has considered the additional evidence submitted by defendants, and finds that these submissions cure the deficiency which undermined their motions as originally presented. Accordingly, the undersigned will VACATE his prior order denying the motions to disinter, and those motions will now be GRANTED. An appropriate order will enter contemporaneously with this memorandum.

1

## I.

The underlying facts in this matter have been stated in the various motion papers, and were given brief exposition in the undersigned's prior memorandum and order, as follows:

American Medical Alert Corp. d/b/a Voicecare manufactures and markets a VoiceCare Personal Response System composed of a two-way voice console and a personal activator worn around the neck by a lanyard. Secure Wireless, Inc. manufactures the alarm button and distributes it attached to a nylon cord that is hung around the neck. Plaintiffs allege that on November 13, 2006, Mitchell Lee Brewer, the deceased, was strangled to death by his VoiceCare nylon lanyard. (Docket Entry No. 1, Am. Compl, at ¶¶ 48-52 ).

At the time of the accident, Mr. Brewer used a motorized wheelchair because he was physically disabled by a stroke which had paralyzed the left side of his body. Id. at ¶¶ 21-22. Plaintiff alleges that she returned from work early in the morning on the day of the accident and found her husband hanging from his motorized chair with the VoiceCare nylon lanyard wrapped around his neck. Plaintiff was not wearing the seatbelt to his wheelchair. (Docket Entry No. 40, Depo. of C. Brewer, at 109-110). At the time of his death, Mr. Brewer was alone and there were no witnesses. Plaintiff alleges that the lanyard cord caught on the control knob attached to the right arm of the wheelchair as Mr. Brewer fell. Id. at ¶¶ 49-50.

Mr. Brewer's cause of death was determined by Dr. Joseph I. Hall, M.D., the Wayne County Medical Examiner and a certified practitioner of family medicine, to be asphyxiation secondary to ligature strangulation. Dr. Hall did not order an autopsy to verify this diagnosis, but continues to believe that Mr. Brewer died secondary to strangulation. On

2

the other hand, Dr. Amy R. McMaster, M.D., defendants' expert and a certified forensic pathologist who is the Deputy Chief Medical Examiner for the Metropolitan Nashville/Davidson County Medical Examiner's Office, has opined that the physical findings described in documentation completed by Dr. Hall are medically insufficient to confirm the diagnosis of ligature strangulation as the cause of death, including the finding of petechia in the eyes, upon which Dr. Hall primarily based his cause of death determination. (Docket Entry No. 40-2 at 81-83; Docket Entry No. 55-3 at 53)

II.

It is well settled that "[t]he quiet of the grave, the repose of the dead, are not lightly to be disturbed. Good and substantial reasons must be shown before disinterment is sanctioned." Kusky v. Laderbush, 74 A.2d 546, 547 (N.H.1950) (citing Currier v. Woodlawn Cemetery, 90 N.E.2d 18, 19 (N.Y. 1949)). However, "the right to have a dead body remain unmolested is not an absolute one; it must yield where it conflicts with the public good or where the demands of justice require such subordination." Kusky, 74 A.2d. at 547 (citing Silvia v. Helger, 67 A.2d 28 (R.I. 1949)).

The parties continue to debate the standard which must be met to justify disinterment for purposes of an evidentiary autopsy. Defendants contend that this court is bound to apply the standard invoked by the Sixth Circuit in Deneen v. New England Mut. Life Ins. Co., 615 F.2d 396, 398 (6th Cir. 1980), an accidental death insurance benefits case where the deceased had been autopsied by a county medical examiner in the hours following his death, but the insurer in defending the subsequent litigation sought to invoke its contractual "right and opportunity to examine the body and make an autopsy," and the issue

3

became what showing was required to invoke that right after the burial of the deceased. In Deneen, the burden was framed as requiring that "it be reasonably certain that an examination of the body will reveal something bearing on the rights of the parties which could not otherwise be discovered." Id. However, the Deneen court took pains to reject the broad scope that a literal reading of "something bearing on the rights of the parties" would give to the standard governing requests for disinterment, observing that "[o]ne way or another, an autopsy necessarily affects the interests of the parties in an accidental death benefits case." Id. Without elaborating on the showing that would be required to meet the standard in such a case, the Sixth Circuit in Deneen found it sufficient to say that the purely speculative nature of the expert testimony in that case -- which was basically that the cause of death might possibly be other than had been determined at the original autopsy -- was "inadequate to overcome the strong public policy against disinterment." Id.

Inasmuch as this issue in the case at bar did not arise in the insurance context, but in the context of a Rule 35(a) discovery motion, and the facts are otherwise distinguishable, the undersigned does not view Deneen as binding authority for the standard to be applied to the instant motions. Rather, the undersigned continues to adhere to his original ruling that the showings required by Rule 35 for the autopsy itself (i.e., the controverted nature of the cause of death and the existence of good cause for allowing the requested autopsy) must be supplemented where the body must first be disinterred, to include a demonstration of the necessity of such relief as compared to other medical alternatives, as well as "a strong showing that the examination or autopsy will establish the facts sought." Stephens v. National Gypsum Co., 685 F.Supp. 847, 847-48 (M.D. Ga. 1988). This last requirement of a "strong showing" of what the autopsy will reveal has been stated

4

other ways, as by the court in Sheffield Farms Co., Inc. v. McDonough, 126 A.2d 886, 891 (N.J. 1956), which required the party requesting disinterment and autopsy to show a "reasonable probability" that the true cause of death would be revealed. The undersigned does not find these formulations to be inconsistent with the *result* in Deneen, where the disinterment request failed because the proposed second autopsy was not shown to be "reasonably certain" to reveal facts which would define the rights or legal relations of the parties. Nor does the undersigned agree with plaintiff that "Defendants must show by the greater weight of evidence that disinterment will yield proof that Mr. Brewer died by natural disease and [not] ligature strangulation." (Docket Entry No. 66 at 9)[1] Rather, on the facts of this products liability case, where the decedent undisputedly suffered from a variety of serious medical conditions and had in the past suffered a debilitating stroke, and where no autopsy was ever performed, the undersigned finds that defendants are appropriately required to show, by the greater weight of the evidence, that the autopsy will reveal facts sufficient to ascertain definitively Mr. Brewer's cause of death.

    The undersigned has previously found the elements of good cause, urgent necessity, and the controverted nature of the cause of death to be satisfied here. It is defendants' effort to make the showing of what the autopsy would reveal which the

---

[1]In support of her argument that defendants must be required to show more than merely that the requested autopsy would "either confirm or negative" the claim that plaintiff's death was caused by natural disease, plaintiff cites Matter of Sybers, 583 N.W.2d 890 (Iowa 1998). However, in that case disinterment was sought by the State of Florida for purposes of informing its criminal prosecution of the decedent's husband, and the court emphasized that the criminal context, the language of the applicable Iowa statute, and the fact that the decedent had already been autopsied once drove its decision to vary from prior, civil precedent and require the State "to show by the greater weight of the evidence that disinterment will yield proof of criminal culpability." Id. at 897-98.

5

undersigned found insufficient in his initial denial of the motions to disinter:

> While Dr. McMaster has stated that an autopsy is "necessary to determine whether Mr. Brewer died from strangulation or from natural causes," she has not made the strong showing -- and Defendants have produced no other evidence besides her affidavit and deposition -- that an autopsy would establish the facts sought. (McMaster Aff. at ¶ 8). Defendant Secure Wireless states in its memorandum in support of its motion to disinter that Dr. McMaster "testified that embalming does not affect the condition of the vital organs including the heart, brain, lungs, kidney, or skin." (Docket Entry No. 40 at 8; McMaster Depo. at 31). However, Dr. McMaster noted in her deposition that her "answers are qualified with the degree of embalming" performed on the decedent's body. (McMaster Depo. at 31). Furthermore, she testified that the level of decomposition would impact the ability to determine Mr. Brewer's cause of death and that numerous factors would influence the level of decomposition -- the temperature of the Brewers' home on the day of the accident, the length of time Mr. Brewer remained at his home after he died, insect activity, the amount of time between the death and embalming, the quality of the embalming, the amount of time Mr. Brewer has been buried, the type of casket he was buried in, the type of vault used, and the type of soil in which he was buried. (McMaster Depo. at 29). Defendants have shown that under the right conditions and with the proper embalming, Mr. Brewer's cause of death might be determined. They do not provide any evidence about these conditions or the embalming process, but instead offer mere conjecture as to the chances that his body was well preserved. Since Mr. Brewer has been dead now for almost 33 months, such evidence is crucial in making a strong showing that an autopsy could establish the cause of Mr. Brewer's death.
>
> . . . In light of strong public policy concerns against disinterment, the undersigned finds the speculative nature of Dr. McMaster's testimony inadequate with regard to the embalming process and numerous other conditions that could affect the decomposition of the decedent's body, and therefore finds that Defendants' motions to disinter and perform an autopsy on the decedent should be denied.

## III.

In support of their appeal from the undersigned's denial, defendants have now submitted proof regarding Mr. Brewer's embalming and burial, in the form of the deposition of Mr. Roger Balentine, the funeral director who embalmed Mr. Brewer and sold the casket and vault to his family, as well as proof of the weather conditions in Wayne County during the month of Mr. Brewer's burial. Defendants have also submitted the supplemented affidavit of their expert, Dr. McMaster, who now offers opinions on the viability of Mr. Brewer's body for autopsy based on the evidence from Mr. Balentine and the weather report. In response to this showing, plaintiff attacks the validity of Dr. McMaster's supplemental opinion testimony concerning the degree of decomposition of Mr. Brewer's remains, and otherwise argues that defendants have failed to meet their burden of a "strong showing" of what an autopsy would reveal, but has not put on any competing expert proof as to the degree of decomposition or the expected findings on autopsy.

As to the factors bearing on the degree of decomposition, which all agree is the chief determinant of whether autopsy will yield reliable results, the proof reflects (1) that Mr. Balentine, who embalmed Mr. Brewer's body, is a licensed embalmer and funeral director with at least 20 years of experience embalming (Docket Entry No. 55-2 at 6-7); (2) that the embalming procedure began at approximately 2:00 p.m. on November 13, 2006, the same day that Mr. Brewer was found dead in his home, id. at 11-13; (3) that the body showed no visible signs of deterioration at the time of embalming, other than normal, "purple-ish gray-ish" discoloration, id. at 17, 46;[2] (4) that the body was embalmed successfully and

---

[2] Dr. McMaster testified that green discoloration of the skin is among the recognizable external indicators that decomposition has begun prior to embalment. (Docket Entry No. 40-2 at 88)

7

without incident, with good distribution of the embalming fluid, id. at 22; (5) that the family selected an 18-gauge steel casket with a rubber gasket around the opening, and a lid with latches that interlock with the gasketed base, and a key which cranks the lid and base together for a tighter closure, which key/crank was turned as many times as possible to achieve the tightest closure possible, id. at 27-28, 43-44; (6) that the family selected a weather-treated and painted concrete vault to house the casket, which had a heavy plastic interior lining and was sealed to its lid (which is also concrete and lined with heavy plastic) by an interlocking tongue-and-groove mechanism after the groove had been filled with an epoxy-like sealant, id. at 30-31, 44-45; (7) that the soil in the cemetery where Mr. Brewer is interred is of a rocky nature, rather than sandy or clay, id. at 32, 70-71; and (8) that the range of outside temperatures was between 26 degrees and 58 degrees Fahrenheit between the time of Mr. Brewer's death on November 13, 2006, and his burial on November 15, 2006 (Docket Entry No. 55-5 at 2).

After reviewing the aforementioned facts among others, Dr. McMaster concluded her supplemental affidavit with the following assertion: "It is my medical opinion that Mr. Brewer's body will be sufficiently preserved after four years of burial to perform an autopsy that is reasonably certain to provide sufficient facts to determine Mr. Brewer's cause of death." (Docket Entry No. 55-1 at 7, ¶ 13) Plaintiff challenges this expert opinion as lacking an adequate foundation, and the undersigned is inclined to agree, at least as it pertains to the extent of preservation against outside elements. While Dr. McMaster appears qualified to offer an expert medical opinion that an embalmed corpse will yield a viable autopsy after four years of burial if its environment is well protected from outside elements, the opinion quoted above does not appear to be within her realm of expertise or experience,

8

but merely represents her deduction, based on the testimony of Mr. Balentine and the report of prevailing weather conditions, that the body of Mr. Brewer will have been sufficiently protected from outside elements these last three years to enable a viable autopsy.

Despite this deficiency of expert proof regarding the extent of expected preservation versus decomposition, it remains clear to the undersigned that the greater weight of the evidence of record supports the belief that, in all reasonably probability, the body will be sufficiently preserved to enable a viable autopsy. Defendants are not necessarily burdened with establishing this factor by expert testimony, nor are they required to show that the body will in fact prove to have been sufficiently preserved; indeed, Mr. Balentine's testimony and the documentation exhibited thereto establish that the ability of caskets and vaults of any construction to "seal" against any and all contaminants is roundly disclaimed by the funeral industry and its regulators, and opinions from the appropriate experts could doubtless be procured on either side of the issue. The record as it now stands in this case contains considerable evidence of the measures taken to preserve Mr. Brewer's body, and, industry disclaimers notwithstanding, the evidence that these measures will prove to have been insufficient after three years of burial is nonexistent. Accordingly, the undersigned finds that defendants have cured the deficiency identified in the rejection of their initial attempt to secure disinterment, in that their position on whether viable autopsy is possible is no longer based on speculation, but on proof of the variables which affect the expected rate of decomposition.

Moreover, the proof establishes, to a reasonable degree of medical certainty, that the physical findings which would exclude strangulation as a cause of death, or which would confirm the occurrence of a natural event causing or contributing to death, would

9

remain present in Mr. Brewer's body. Specifically, Dr. McMaster testified in her deposition that gross anatomic evidence of stroke, acute myocardial infarction, acute coronary thrombosis, aneurysm, or ruptured lung will be apparent in an embalmed body as long as it is otherwise well preserved. (Docket Entry No. 40-2 at 80-81, 92) Perhaps more compellingly, Dr. McMaster testified to her expectation that given the narrowness of the ligature in this case, Mr. Brewer's strangulation could be definitively established by a specialized neck dissection revealing hemorrhages in the neck muscles, a finding which "tells me that he was still alive at the time that the ligature was wrapped around his neck as opposed to dropping dead from a terminal disease and then being found in the position in which he was found." Id. at 103, 116-17. Again, this evidence of the findings which an autopsy would be expected to disclose is uncontroverted. Cf. Camilli v. Immaculate Conception Cemetery, 583 A.2d 417, 419 (N.J. Super. Ct. 1990) (disallowing action for disinterment and autopsy where, despite evidence supporting the security of the casket, vault, and burial ground against elements which would accelerate decomposition, the competing medical expert testimony was in equipoise, and thus there was "no clear and convincing showing ... that a dissection and examination of decedent's brain tissue would, in all reasonable probability, establish the affirmative evidence sought....").

        In sum, the undersigned is now satisfied with the strength of defendants' showing that disinterment and autopsy will reveal facts sufficient to definitively ascertain Mr. Brewer's cause of death. Accordingly, the motions to disinter will be GRANTED by contemporaneous order. The undersigned will reserve ruling on the matter of whether Dr. McMaster or another forensic pathologist will perform Mr. Brewer's autopsy, pending further discussion with the parties via teleconference with the court.

10

Case 1:08-cv-00069   Document 67   Filed 01/20/10   Page 10 of 11 PageID #: 1293

An appropriate order will enter.

**ENTERED** this 20th day of January, 2010.

                                           s/ John S. Bryant
                                           JOHN S. BRYANT
                                           UNITED STATES MAGISTRATE JUDGE